1

2

3

4

5

6

7

8                           IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES BABB,

11              Plaintiff,                    No. CIV S-00-0023 MCE DAD P

12        vs.

13   DR. CALVO, et al.,                       ORDER AND

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16              Plaintiff, a state prisoner proceeding with counsel, has filed a civil rights action

17   pursuant to 42 U.S.C. § 1983 challenging his medical care while incarcerated at California State

18   Prison - Solano.  This matter is before the court on the motion for summary judgment filed on

19   behalf of defendants Low, Greenough, Hu, and Capon on April 12, 2005.  At a hearing held on

20   May 13, 2005, supervising attorney Carter White and certified law students Paul Whitfield and

21   Anna Valiente, with the King Hall Civil Rights Clinic, appeared on behalf of plaintiff.  Deputy

22   Attorney General Gary Binkerd appeared on behalf of the defendants.  Having considered all

23   materials submitted in connection with the motion, and after hearing oral argument, the

24   undersigned will recommend that defendants' motion be granted in part and denied in part.

25              At the hearing on the motion plaintiff's counsel affirmed plaintiff's non-

26   opposition to the dismissal of defendants Greenough and Capon from this action.  Therefore, the

1

granting of summary judgment in favor of those defendants will be recommended.  Below, the

court will address the motion as it pertains to the remaining defendants Dr. Kenneth Low, the

facility physician at CSP-Solano, and nurse Kelly Hu.

PROCEDURAL HISTORY

On January 4, 2000, plaintiff filed his initial civil rights complaint pro se.

Following the filing of several amended complaints, the court appointed counsel for plaintiff on

March 15, 2002.  The operative complaint is the fifth amended complaint, filed by plaintiff's

counsel on June 3, 2003.

Defendants have filed three motions to dismiss this action due to plaintiff's

alleged failure to exhaust administrative remedies.[1]  The motions were denied.  Subsequently,

defendant Low filed his answer on January 21, 2004.  Defendants Greenough, Hu, and Capon

filed their answer on March 19, 2004.

The court's pretrial scheduling order was filed on May 6, 2004, but due to

ongoing disputes concerning discovery, an amended scheduling order was filed on October 28,

2004.  Further discovery disputes again required resetting the dates for the close of discovery and

the filing of dispositive motions.  By order filed on December 8, 2004, new dates were set for the

close of discovery and law and motion and a new pretrial conference date was set.

On April 8, 2005, defendants filed an ex parte request requesting that the close of

law and motion be extended in order to allow defendants to file a motion for summary judgment.

On April 11, 2005, the request was denied without prejudice because defendants had not sought

---

[1]  Because defendants Greenough, Capon and Hu were served process after defendant
Low had already been served, the three motions were not joined in by all named defendants.  On
January 9, 2003, defendant Low filed a motion to dismiss the fourth amended complaint.  On
August 1, 2003, the motion was denied without prejudice because plaintiff was granted leave to
file a fifth amended complaint.  On September 15, 2003, defendant Low filed a second motion to
dismiss for failure to exhaust administrative remedies.  The findings and recommendation were
adopted and defendant Low's motion was denied on January 6, 2004.  On December 19, 2003,
defendants Greenough, Hu, and Capon also filed a motion to dismiss for failure to exhaust
administrative remedies.  On March 10, 2004, the findings and recommendations were adopted
and defendants Greenough, Hu and Capon's motion was denied.

1  or obtained a stipulation from opposing counsel.  On April 12, 2005, defendants filed a new

2  request and stipulation by the parties to extend the time for defendants to file their summary

3  judgment motion.  On April 13, 2005, the defendants' request was granted and defendants'

4  motion was placed on the court's law and motion calendar for hearing and was thereafter taken

5  under submission.

6          The case is currently scheduled for pretrial conference before the Honorable

7  Morrison C. England, Jr. on August 8, 2005, and for trial on September 21, 2005.

8                          PLAINTIFF'S FIFTH AMENDED COMPLAINT

9          Plaintiff claims that defendants violated his rights under the Eighth Amendment

10  when they were deliberately indifferent to his serious medical needs while he was confined at

11  California State Prison - Solano (CSP-Solano).  According to plaintiff's fifth amended

12  complaint, in February of 1999, he began experiencing severe stomach pain, extreme weight loss

13  and difficulty with urination and bowel movements.  Plaintiff sought medical treatment from

14  defendant Dr. Low who gave him laxatives.  Plaintiff was tested for Prostate Specific Antigens

15  (PSA) and the test revealed elevated PSA levels.  From February 1999 to September 1999,

16  defendant Low was aware of plaintiff's elevated PSA levels but did not take any action to

17  determine the cause thereof.  Plaintiff continued to request that further tests be conducted in

18  order to obtain a medical diagnosis and from February 1999 through October 1999, continued to

19  request medical treatment for his severe pain.  Defendant Low's only response was to give

20  plaintiff laxatives, despite plaintiff's protest that the laxatives did not alleviate the pain and

21  discomfort.

22          On October 6, 1999, a prostate biopsy was performed, and the postoperative

23  diagnosis was: "Benign Prostatic Hypertrophy.  Rule out cancer of the prostate gland." (Compl.

24  ¶ 15, at 4.)  Although plaintiff's medical file noted plaintiff's enlarged prostate gland, defendant

25  Low never connected this medical finding with plaintiff's complaints of pain when urinating and

26  having bowel movements.

1    In November of 1999, a biopsy was positive for prostate cancer.  No action was

2  taken to treat the cancer until March 15, 2000, when plaintiff began radiation treatment.  The

3  radiation treatments continued until approximately May 8, 2000.  Plaintiff continued to have

4  extreme pain during urination and bowel movements but was told by defendant Low that this was

5  a side effect of the radiation treatments and plaintiff was merely given laxatives.

6    Finally, plaintiff was unable to urinate from May 26, 2000 to June 3, 2000.  At

7  some time between May 28 and May 30, 2000, plaintiff went to the medical clinic complaining

8  of unbearable pain in his lower abdomen.  His bladder was so swollen that the outline of his

9  bladder could be seen.  Defendant nurse Hu refused to see plaintiff despite his pleas for

10  assistance.  On June 3, 2000, plaintiff was in extreme pain and showed defendant Dr. Low his

11  protruding bladder.  Plaintiff begged for some type of medical assistance and was told by

12  defendant Low that he should ignore the pain and if he continued to complain, he would be

13  transferred to a different prison.  Plaintiff was sent back to his cell where he collapsed on the

14  floor and lapsed into unconsciousness.  Plaintiff was transferred to the emergency department at

15  Doctor's Hospital at Manteca.  There, doctors determined that plaintiff's kidneys had shut down

16  due to the excessive fluid build-up and that his health problems were due to his enlarged prostate

17  gland.

18    Plaintiff returned to CSP-Solano on June 6, 2000 and was seen by defendant Dr.

19  Low on or about July 14, 2000 to remove and replace a catheter.  Three days later, plaintiff began

20  having problems with the catheter.  Defendant Low inserted a new catheter and it began to fill

21  with blood and urine.  Plaintiff was sent back to his cell and attempted to tolerate the pain.  After

22  about thirty minutes, the catheter came out and plaintiff returned to the clinic where defendant

23  Low inserted another catheter.  For fourteen to fifteen days, plaintiff continued to be in pain and

24  blood continued to fill the catheter.  Plaintiff would return to the clinic and defendant Low would

25  send plaintiff back to his cell contending that the bleeding was normal.  On August 3, 2000,

26  medical technical assistant Rowe inserted another catheter and told plaintiff that the previous

4

1  catheter stem was not long enough and that this caused plaintiff's bleeding and pain.  Plaintiff

2  has subsequently undergone surgeries at the San Francisco Medical Center because of damage

3  done to his urinary system.

4                    STANDARDS FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

5           Summary judgment is appropriate when it is demonstrated that there exists "no

6  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7  matter of law."  Fed. R. Civ. P. 56(c).

8           Under summary judgment practice, the moving party always bears
            the initial responsibility of informing the district court of the basis
9           for its motion, and identifying those portions of "the pleadings,
            depositions, answers to interrogatories, and admissions on file,
10          together with the affidavits, if any," which it believes demonstrate
            the absence of a genuine issue of material fact.

11

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16  after adequate time for discovery and upon motion, against a party who fails to make a showing

17  sufficient to establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19  concerning an essential element of the nonmoving party's case necessarily renders all other facts

20  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21  whatever is before the district court demonstrates that the standard for entry of summary

22  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23          If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of this factual dispute, the opposing party may not rely upon the

5

1    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2    form of affidavits, and/or admissible discovery material, in support of its contention that the

3    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

4    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

5    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

7    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

8    return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

9    1436 (9th Cir. 1987).

10           In the endeavor to establish the existence of a factual dispute, the opposing party

11   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

12   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

13   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

14   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

15   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

16   committee's note on 1963 amendments).

17           In resolving the summary judgment motion, the court examines the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

20   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

21   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

22   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

23   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

24   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

25   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

6

1    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2    'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

3                                 ANALYSIS

4    I.   <u>Legal Standards Applicable to Plaintiff's Civil Rights Claim</u>

5            The Civil Rights Act under which plaintiff is proceeding provides that

6            [e]very person who, under color of [state law] . . . subjects, or
             causes to be subjected, any citizen of the United States . . . to the

7            deprivation of any rights, privileges, or immunities secured by the
             Constitution . . . shall be liable to the party injured in an action at

8            law, suit in equity, or other proper proceeding for redress.

9    42 U.S.C. § 1983.

10           The statute requires an actual connection or link between the actions of each

11    defendant and the deprivation alleged to have been suffered by the plaintiff. <u>See</u> <u>Monell v.</u>

12    <u>Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). "A

13    person 'subjects' another to the deprivation of a constitutional right, within the meaning of

14    § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to

15    perform an act which he is legally required to do that causes the deprivation of which complaint

16    is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

17           A prisoner's claim of inadequate medical care arises under the Eighth

18    Amendment. The unnecessary and wanton infliction of pain constitutes cruel and unusual

19    punishment forbidden by the Eighth Amendment. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986);

20    <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).

21    In order to prevail on an action alleging cruel and unusual punishment, a prisoner must allege and

22    prove that objectively he or she suffered a sufficiently serious deprivation and that subjectively

23    prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.

24    <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991).

25           Where a prisoner's Eighth Amendment claim is one of inadequate medical care,

26    the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate

1   indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. at 106.  Such a claim has

2   two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's

3   response to that need." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991).  A medical

4   need is serious "if the failure to treat the prisoner's condition could result in further significant

5   injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin</u>, 974 F.2d at 1059 (quoting

6   <u>Estelle</u>, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a

7   medical condition that significantly affects an individual's daily activities." <u>Id.</u> at 1059-60.  By

8   establishing the existence of a serious medical need, a prisoner satisfies the objective requirement

9   for proving an Eighth Amendment violation.   <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

10         If a prisoner establishes the existence of a serious medical need, he or she must

11   then show that prison officials responded to the serious medical need with deliberate

12   indifference. <u>Farmer</u>, 511 U.S. at 834.  In general, deliberate indifference may be shown when

13   prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown

14   by the way in which prison officials provide medical care. <u>Hutchinson v. United States</u>, 838 F.2d

15   390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been

16   abridged with regard to medical care, however, "the indifference to his medical needs must be

17   substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this

18   cause of action." <u>Broughton v. Cutter Laboratories</u>, 622 F.2d 458, 460 (9th Cir. 1980) (citing

19   <u>Estelle</u>, 429 U.S. at 105-06).  <u>See also</u> <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004).

20   Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires

21   'more than ordinary lack of due care for the prisoner's interests or safety.'" <u>Farmer</u>, 511 U.S. at

22   835 (quoting <u>Whitley</u>, 475 U.S. at 319).

23         Delays in providing medical care may manifest deliberate indifference. <u>Estelle</u>,

24   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay, a plaintiff

25   must show that the delay was harmful. <u>See</u> <u>Berry v. Bunnell</u>, 39 F.3d 1056, 1057 (9th Cir. 1994)

26   (per curiam); <u>McGuckin</u>, 974 F.2d at 1059; <u>Wood v. Housewright</u>, 900 F.2d 1332, 1335 (9th Cir.

1  1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State

2  Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).

3          Mere differences of opinion between a prisoner and prison medical staff as to

4  proper medical care do not give rise to a § 1983 claim.  See Jackson v. McIntosh, 90 F.3d 330,

5  332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

6  F.2d 1337, 1334 (9th Cir. 1981).

7  II.  Defendants Arguments and Evidence[2]

8          In their motion for summary judgment defendants contend that the undisputed

9  material facts establish that they provided plaintiff with constitutionally adequate medical care.

10  Defendants rely heavily on the opinions of their two medical experts, Dr. David T. Harrison and

11  Dr. James K. Mooney in this regard.  (Am. Mem. P. & A. (Defs.' P&A) at 2.)  Dr. Harrison

12  specializes in medical oncology and, based upon his review of plaintiff's medical records,

13  concludes as to the ultimate legal question posed in this case that the defendants "met the

14  applicable standard of care in the medical community for their respective professions in all

15  respects regarding the care and treatment rendered to or on behalf of Mr. Babb for the time frame

16  designated in his complaint."  (Defs.' List of Ex.s and/or Evidence (Defs.' Ex.s), Ex. G, ¶ 9 at 3.)

17  However, as to plaintiff's hospitalization on June 3, 2000, Dr. Harrison does state:

18          [T]he painful incident of urinary retention for which plaintiff was
           hospitalized June 3, 2000 for emergency bladder catheterization
19          appeared to be avoidable had it earlier been diagnosed and treated,
           but that incident appeared to be wholly the result of a condition
20          that unfortunately was innocently (and perhaps understandably)
           overlooked, and was not in my opinion the result of a known
21          condition or risk being consciously or deliberately ignored by any
           medical practitioner involved in his care, including any defendant
22          in this case . . . ."

23  ─────────────────

24          [2] On April 15, 2005, defendants electronically filed a document titled, "List Of Exhibits
   And/Or Evidence Filed In Support Of Defendant's Motion For Summary Judgment."
25  Defendants submitted a chambers courtesy copy of the list of exhibits and attached the exhibits
   which were consecutively marked as Exhibit A to Exhibit AA and which the court has relied
26  upon.  It appears that due to inadvertence, the exhibits were neither electronically filed nor filed
   in paper format with the court.  Therefore, the court will order defendants to file their exhibits.

1  (Id., Ex. G ¶ 9(h) at 5.)  Dr. Harrison's opinion did not change after having read the report of

2  plaintiff's expert, Dr. Gary Grossfeld, dated December 30, 2004.  (Id., Ex. G ¶ 10 at 5.)

3  Dr. Mooney specializes in urology and opines, based upon his review of plaintiff's

4  medical records, that plaintiff had a small quantity of prostate cancer which many urologists and

5  patients elect to treat with "Watchful Waiting."  (Id., Ex. H ¶ 12(c) at 4.)  He therefore concludes

6  that, "no harm likely would have resulted even if it had taken several more years to diagnose and

7  treat his cancer" since "[c]ancer of the prostate is a slow growing tumor and treatment often is

8  started many months following diagnosis."  (Id., Ex. H ¶ 12(f) at 5.)  As to plaintiff's treatment

9  with laxatives, Dr. Mooney takes the position that since plaintiff had been on laxatives since

10  1991 or earlier, continuing this treatment was not evidence of deliberate mistreatment.  (Id.)  Dr.

11  Mooney also expresses his view that plaintiff "did not present urinary symptoms to Dr. Low

12  justifying treatment."  (Id.)  Tellingly, Dr. Mooney reports that he was "not able to find any

13  corroboration" in plaintiff's medical records to support his testimony that defendant nurse Hu

14  failed to respond appropriately to his claim that his bladder was distended.  (Id., Ex. H ¶ 12(h) at

15  5.) (emphasis added).

16  Dr. Mooney also expresses the opinion that:

17  Mr. Babb's persistent and frequently demanding attempts to
   achieve the attention of his caregivers ultimately rendered him a
18  very difficult patient to evaluate when something serious was
   occurring. . . .  Like millions of other men, this patient eventually
19  went into [urine] retention, and needed a catheter.  Dr. Low is an
   internist and not a urologist.  I see patients all the time in retention
20  with symptoms that I would easily recognize because that is what I
   do.  However, as was undoubtedly the situation in Dr. Low's case,
21  the referring internists often don't recognize these symptoms
   leading to retention, and they do not have the necessary equipment
22  a urologist possesses to enable them to make such a diagnosis.

23  /////

24  /////

25  /////

26  /////

1  (Id., Ex. H ¶ 13 at 6-7.)[3]  Defendants argue that plaintiff's own medical expert has conceded that

2  a primary care physician might not be familiar with the treatment of urinary symptoms or the

3  after-effects of radiation therapy.[4]  In the end, Dr. Mooney expresses his opinion with respect to

4  the legal question posed by this action, concluding that there is no objective evidence suggesting

5  /////

6

7      [3]  In his own declaration, defendant Dr. Low states:

8           On the occasion of plaintiff's visits to the clinic between May 15,
            2000 and June 3, 2000, although he repeatedly complained of
9           *gastro-intestinal* problems and abdominal discomfort and pain that
            appeared to be associated with those problems, I never associated
10          either his reported symptoms or my objective findings with a
            substantial or serious *urological* issue, much less significant
11          urinary retention.

12          On each and every occasion I encountered plaintiff from May 15,
            2000 to June 3, 2000, I attempted to determine the cause of his
13          symptoms, including his reported abdominal pain, but did not
            appreciate he might have been suffering from extensive urinary
14          blockage as a possible aftereffect of his recent course of radiation
            therapy; I have never before encountered a similar case and, not
15          being a urologist, am not trained and not competent to recognize
            and treat the aftereffects of an irradiated prostate gland and
16          adjoining irradiated tissues.

17  (Defs.' Ex.s, Ex. I at 4.)

18      [4]  Defendants rely on the following excerpt from Dr. Grossfeld's deposition in making
    this assertion:
19
            Q [Mr. Binkerd]:  . . . .  Would you expect a primary physician to
20          be as familiar with treatment aspects of the after effects [of
            radiation therapy]?
21
            A [Dr. Grossfeld]:  Treatment as a urologist?
22
            Q:  Yes.  Well, as either urologist, oncologist or from your point of
23          view as a urological oncologist?

24          A:  I would not expect a primary care physician to be as familiar
            with the treatment of the after effects of radiation therapy or
25          urinary systems in general as a urologic oncologist.

26  (Defs.' Ex.s, Ex. B at 42:6 - 42:15.)

1   that any defendant deliberately ignored or refused to treat any serious medical condition of which

2   they were aware.  (Id. Ex. H ¶18 at 8.)

3              In this same vein defendants argue that the deposition testimony of plaintiff's

4   medical expert, Dr. Grossfeld, fails to establish the required elements for an Eighth Amendment

5   medical care claim.  (Defs.' P&A, at 3.)  Defendants argue that Dr. Grossfeld employed a

6   negligence standard rather than a deliberate indifference standard in reviewing plaintiff's

7   medical records and even then could only find fault with the medical care provided plaintiff from

8   May 15, 2000 to June 3, 2000.[5]  (Id.)  This nineteen day period followed plaintiff's two-month

9   radiation treatment for prostate cancer and continued until his hospitalization for an emergency

10  bladder catheterization.  (Id. at 3-4.)  Defendants point out that although Dr. Grossfeld broadly

11  criticized all medical practitioners who provided or supervised "hands-on" care during that time

12  period, he offered no opinion as to the quality of care provided by each defendant.  (Id. at 5-6.)

13  Having constructed this straw man defendants proceed to knock him down, arguing that their

14  motion for summary judgment should be granted because plaintiff has presented no expert

15  opinion that any defendant acted with deliberate indifference.  (Id. at 6.)

16             In their motion defendants also focus solely on the interactions each defendant had

17  with plaintiff between May 15 and June 3, 2000.  As to defendant Dr. Low, defendants argue that

18  there is no evidence that defendant Low dismissed any of plaintiff's complaints of pain or

19  problems with urination or bowel movement during this period.  (Id. at 4-5.)  To the extent that

20  defendant Low may have told plaintiff that his symptoms were a side effect of the radiation

21  therapy, defendants argue that this was defendant Low's genuine, albeit misguided, belief.  (Id. at

22  5.)  Defendant Low argues that plaintiff was hostile and uncooperative toward him thus impeding

23

24         [5]  In the amended memorandum of points and authorities, defendants indicate that "19
    days from March 15 to June 3, 2000," is the time period Dr. Grossfeld identified as the period
25  during which plaintiff received inadequate medical care.  (Am. Mem. P. & A. at 3.)  However, it
    appears that this is a typographical error and that the actual period in issue is May 15, 2000 to
26  June 3, 2000.  (See Grossfeld Dep. at 50-52.)

1    optimal medical care and treatment.  (Id. at 10.)  In support of this argument defendant Low notes

2    that plaintiff has a documented history of being an uncooperative patient and suffers from a

3    perceived persecutory and delusional disorder.  (Id. at 12.)

4            Next, defendants contend that defendant Low was not responsible for follow-up

5    care related to plaintiff's radiation therapy and that such responsibility rested with plaintiff's

6    urologist, Dr. Athanassious.  (Id. at 11.)  Defendants also rely on the purported inconsistencies in

7    plaintiff's deposition testimony.  (Id.)  In this regard, they argue that although plaintiff testified

8    that he had been unable to urinate for 4 to 5 days, there are no medical records confirming that

9    plaintiff had informed anyone of this problem.  (Id. at 12.)  Defendants contend that when

10   plaintiff saw defendant Low, he only complained of "'having difficulty urinating'" and that he

11   did not make his first complaint to defendant Low about being unable to urinate for a period of

12   time until June 3, 2000.[6]  (Id. at 11-12.)  Defendants conclude by arguing that on June 3, 2000

13   Dr. Low reacted properly to the situation by ordering plaintiff's bladder catheterized and drained,

14   and when catheterization attempts failed, ordering plaintiff transported to the hospital where the

15   procedure was performed successfully.  (Id. at 12-13.)

16   _____

17        [6]  In his declaration, defendant Low states:

18           Although he did previously complain of having some urinary
             difficulties that he failed or refused to describe, even when prodded
19           to do so, it was not until June 3, 2000, that plaintiff first
             communicated that he had been able to urinate only a minor
20           amount for an appreciable period of time.  Even then, his evident
             abdominal discomfort and bladder distention notwithstanding, his
21           claim appeared inconsistent in my mind with other objective
             indicators and findings.  I continued to associate his symptoms
22           with a *gastro-intestinal* issue (tenesmus, the perceived but false
             need to defecate) rather than a *urological* issue.  Nevertheless, for
23           the first time having been given at least some reason to suspect that
             he was unable to urinate and possibly was suffering the effects of a
24           full and distended bladder, and thus a serious and possibly urgent
             medical need, I immediately ordered that his bladder be
25           catheterized and emptied of any urine he in fact may have been
             retaining.

26   (Defs.' Ex.s, Ex. I at 5.)

                                                    13

1    Defendant nurse Hu argues that there is no evidence that she refused to see

2  plaintiff at the clinic between May 28 and May 30, 2000.  (Id. at 5-7.)  She contends that the

3  housing unit logs do not reflect any escorts that plaintiff received to the medical clinic during that

4  time.[7]  (Id. at 6-8.)  Defendant Hu contends that her only encounter with plaintiff during the

5  relevant time period was on May 23, 2000.[8]  (Id. at 6.)  In this regard, she contends that plaintiff

6  came to the clinic after regular hours and that her responsibility was to triage and assess plaintiff

7  to determine if he needed to be seen by the on-call physician.  (Id. at 7.)  Counsel on nurse Hu's

8

9       [7] However, the litigation coordinator at California State Prison - Solano, explains in her
   declaration how the unit housing logs are maintained at the institution as follows:
10

11         Unit Housing Logs consist of journal entries of events occurring
           within particular housing units of the institution, especially those
12         believed to impact or potentially impact safety and security
           concerns; they essentially are handwritten diaries of particular
13         housing units, and as such, entries can be of any inmate, custodial
           staff members, or other individual involved in any even deemed
14         worthy of recordation by on-duty custodial staff; the logs
           occasionally include entries reflecting escorted (by custody
15         officers) clinic or infirmary visits of inmates, but there is no
           institutional requirement that all such visits be recorded, and not all
16         such escorted visits necessarily are so logged.

17  (Defs.' Ex.s, Ex. W at 1-2.)

18       [8] In her declaration, defendant Hu states:

19         I deny that I ever refused to see, exam, or assess Mr. Babb's
           condition on the occasion of any professional encounter with him,
20         or would ever ignore, refuse or deny thorough assessment or
           appropriate treatment to a patient presenting with such complaints
21         and symptoms as those which plaintiff alleges in his Fifth
           Amended complaint to have been experiencing on the occasion of
22         said encounter.

23         The fact there is no medical record of any kind reflecting any
           encounter or any opportunity for such an encounter between Mr.
24         Babb and myself on any date other than May 23, 2000 is consistent
           with my recollection, and is consistent with my belief Mr. Babb
25         and I had no contact with one another, professional or otherwise,
           between May 23 and June 3, 2000.

26  (Defs.' Ex.s, Ex. J at 4.)

behalf argue that the medical records indicate that plaintiff complained of constipation but did

not mention an inability to void his bladder.  (Id.)  Defendant Hu gave plaintiff a ducat so that he

would be seen by Dr. Scotti the next morning.  (Id. at 7-8.)  In addition, defendant Hu contends

that she checked on plaintiff's status about two and a half hours later and was told by custody

staff that he was sleeping soundly.  (Id. at 8.)  Defendants argue that plaintiff's own medical

expert testified that plaintiff could not have survived if he had retained urine from May 23 to

June 3, 2000, when plaintiff was hospitalized.  (Id.)  They also point to the fact that Dr. Scotti's

examination the morning after Nurse Hu gave plaintiff a ducat revealed no distended bladder.

(Id.)  Lastly, defendants contend that two notes written by plaintiff support the contention that

defendant Hu did not refuse to see plaintiff.[9]  (Id. at 9.)  One note bearing a date of March 22,

2001, states that on May 23, 2000, nurse Hu was unaware of the extent of pain he was

experiencing.  (Id.; Defs.' Ex.s, Ex. M.)  A second note is undated but is directed to defendant

Capon stating merely that plaintiff wishes to drop the grievance filed against defendant Hu.

(Defs. P&A at 9.)

          In conclusion, defendants argue that there is no evidence of deliberate indifference

because none of the defendants were aware that plaintiff was suffering from urinary retention.

(Id. at 20.)  Rather, plaintiff's symptoms were attributed to a gastro-intestinal ailment and not to a

urological malady.  (Id.)  Defendants contend that there is no issue of fact to be resolved by a jury

since a difference of opinion among medical experts does not establish an Eighth Amendment

violation.  (Id. at 23.)

/////

/////

---

[9]  There is considerable discussion by the parties as to the authenticity of these notes.
Plaintiff disputes that he wrote the notes, while a forensic handwriting expert employed by
defendants opines that the notes were written by plaintiff.  In any event, the court believes that
the arguments of  both parties miss the mark since the notes are not dispositive of the issue of
whether defendant Hu refused to provide medical care to plaintiff.

1   III.  Plaintiff's Arguments and Evidence

2              Plaintiff argues that there are facts in dispute material to resolution of the issue as

3   to whether defendant Hu and defendant Low were deliberately indifferent to plaintiff's serious

4   medical needs.

5              Plaintiff disputes defendant Hu's assertion that she had only a single encounter

6   with plaintiff on May 23, 2000.  (Pl.'s Mem. P. & A. (Pl.'s P&A) at 5.)  Plaintiff contends that on

7   two occasions that day, correctional officers attempted to procure medical attention for plaintiff

8   and escorted him to the clinic because he was experiencing severe pain.  (Id. at 5-6; Pl.'s List of

9   Exhibits and/or Evidence (Pl.'s Ex.s), Ex. F[10].)  Plaintiff asserts that at that time defendant Hu

10  refused to see plaintiff.  (Pl.'s P&A at 6.)  According to plaintiff, defendant Hu failed to follow

11  CSP - Solano procedures and did not conduct an assessment including the taking of his vital

12  signs.  (Id.)  Plaintiff also questions the accuracy of certain records relied on by defendants.  (Id.)

13  In this regard, medical records dated May 23, 2000 at 1830 hours indicate that defendant Hu

14  performed an assessment on plaintiff.  However, plaintiff claims that no physical examination

15  was conducted.  (Id. at 6-7.)  In support of this assertion, plaintiff refers to the memorandum

16  authored by correctional officer Krog, dated May 23, 2000.  (Pl.'s Ex.s, Ex. F.)  In that

17  memorandum, officer Krog reported that at approximately 1810 hours that day, defendant Hu

18  refused to see or treat plaintiff even though he was experiencing severe abdominal pain.  (Id.)

19  Officer Krog also reported that he informed the nurse that he intended to document the incident

20  with the Facility Lieutenant.  (Id.)  Plaintiff also disputes defendant Hu's assertion that she made

21  a phone call to check on plaintiff's status and was told that he was sleeping peacefully at 2100

22  hours.  (Pl.'s P&A at 8.)  Plaintiff questions this assertion since at 2300 hours he was taken to the

23  medical clinic complaining of severe abdominal pain and was given pain medication by another

24  nurse.  (Id.; Pl.'s Ex.s, Ex. E at 1.)  Finally, plaintiff challenges the authenticity of the notes

25

26        [10]  Pursuant to the jointly proposed protective order this document was filed under seal.

1   which defendants allege that plaintiff wrote since, despite an ongoing administrative

2   investigation, defendant Hu did not produce the notes until February of 2005 while contending

3   that they were in her employee locker where they had remained for nearly five years.  (Pl.'s P&A

4   at 9.)  Plaintiff argues that defendant Hu was deliberately indifferent to his medical needs as

5   demonstrated by her failure to conduct a medical assessment and to follow standard medical

6   procedures when plaintiff was suffering from extreme abdominal pain.  (Id. at 13.)

7          As for defendant Dr. Low, plaintiff contends that he went to the clinic at least

8   once a day between May 17 and June 3, 2000, as his chronic difficulties with urination continued

9   to grow worse.  (Pl.'s Ex.s, Ex. N at 3.)  According to plaintiff, defendant Low's only response

10  was to treat plaintiff with laxatives and painkillers, both of which were completely ineffective.

11  (Id. at 4.)  When plaintiff was in extreme pain and rushed to the infirmary on June 2, 2000,

12  defendant Low was unable to insert a catheter and on June 3, 2000 the procedure had to be

13  performed at Doctor's Hospital in Manteca.  (Id. at 5.)  There, 2500 cc of urine were drained

14  from plaintiff's bladder, a dangerously high amount.  (Id.)  Plaintiff argues that defendant Low

15  was deliberately indifferent to his medical needs because Dr. Low was aware that plaintiff had

16  difficulty voiding his bladder but nonetheless allowed plaintiff to retain urine to the point that

17  plaintiff's kidneys were beginning to lose functionality.[11]

18         Perhaps most important to resolution of the pending motion is plaintiff's own

19  sworn testimony as to the events in question.  In this regard, at his deposition plaintiff explained

20  how he informed the medical staff of his inability to urinate:

21

22         [11]  Plaintiff acknowledges that his own medical expert, Dr. Grossfeld, was unaware at the
    time of his deposition of the legal distinction between negligence and deliberate indifference.
23  However, plaintiff argues that Dr. Grossfeld is qualified to express an opinion regarding whether
    a doctor's care is inadequate and found the medical care provided to plaintiff by defendant Dr.
24  Low to be inadequate.  Plaintiff also provides Dr. Grossfeld's declaration in which he states that
    upon review of defendant Low's deposition, it is Dr. Grossfeld's opinion that defendant Low
25  "failed to take reasonable measures to ensure Mr. Babb's health and safety[,]" and if defendant
    Low was aware of plaintiff's condition, this constitutes deliberate indifference.  (Id., Pl.'s Ex.s,
26  Ex. Q at 2.)

1  Q [Binkerd]:  Is there any reason that would have prevented you
   from going to the clinic during this period of several days you had
2  not been able to defecate or urinate completely, anything that
   would have prevented you from going to the clinic and making the
3  infirmary or clinic staff aware of what your problems were?

4  A [Plaintiff]:  They were always aware of what the problem was.

5  Q:  Because you were reporting it to them on a daily basis?

6  A:  Because I was going there - -

7  Q:  Every day?

8  A:  Sometimes every day, sometimes not every day.

9  . . . .

10  Q:  Were you telling the doctors that you couldn't defecate?

11  A:  Yes.

12  Q:  Were you telling the doctors that you were unable to urinate
    completely?

13  A:  Yes.

14  Q:  Were you telling the doctors that you had a swollen bladder?

15  A:  Yes, I showed it to them.  I showed him a picture of it.  It was
16  swollen up large enough that you could see it - - you could see it.  I
    showed it to him.  You could see it.

17  Q:  What picture are you referring to?

18  A:  What picture?

19  Q:  You said you showed him a picture of it.

20  A:  No.   Right here, just like you could raise up, it was - - you
21  didn't have - - you didn't need an x-ray to see it.  You could see an
    imprint of it.  You didn't need an x-ray to see it, you could see an
22  imprint of it.

23  Q:  Did it continue to swell over this period of time?

24  A:  Yes.
    . . . .
25
    Q:  Was it obvious to anybody who looked at it?  Was it obvious to
26  you?

18

1    A: It was obvious to me. It was obvious to the doctor that saw. It
     - - it was obvious.
2    . . . .

3    Q Binkerd]: Tell me any day that you showed your swollen
     abdomen to a doctor.
4
     A: I don't know the exact date but Dr. Low has seen it.
5

6    (Babb Dep. at 36-37.)

7            Likewise,  in his declaration filed in opposition to the defendants' motion for

8    summary judgment, plaintiff states as follows:

9            June 2nd of 2000 I was rushed to the infirmary in a lot of pain.  By
             this time I couldn't urinate at all.  I stayed overnight at the
10           infirmary on June 2nd.  On June 3rd I saw Dr. Low at 9 A.M.  I
             again tried to explain to him how much pain I was in.  I again
11           showed him the imprint of my bladder and asked him to please
             help me.  He responded by telling me that if I kept complaining he
12           was going to have me transferred to another institution, and sent
             me back to my unit.  When I got back to my unit the pain became
13           more severe.  My building officers tried to get Dr. Low at the
             clinic.  He was on duty at the clinic.  No one tried to reach him by
14           pager.  He was at the clinic.  He just would not respond to the
             officers that tried to get him to help me.  After the COs couldn't
15           get Dr. Low to respond to the telephone, I eventually passed out in
             the CO's office. . . .
16

17   (Pl.'s Ex.s, Ex. N at 4-5.)

18   IV.  Discussion

19        A.  Defendant Dr. Low

20           Defendant Low relies on the opinions of the two defense medical experts and the

21   deposition testimony of plaintiff's medical expert in arguing that there is no evidence that he was

22   deliberately indifferent to plaintiff's medical care.  He contends that because plaintiff's medical

23   expert, Dr. Grossfeld, employed a negligence standard in forming his opinion regarding the

24   quality of plaintiff's medical care, there is no evidence in the record contradicting the opinions of

25   his experts who opined that plaintiff received constitutionally adequate medical care and he is

26   /////

1   therefore entitled to summary judgment in his favor.  The court is not persuaded by this

2   argument.

3            Plaintiff has presented evidence that Dr. Low was aware of plaintiff's serious need

4   for medical care.  Specifically, plaintiff has testified that he informed Dr. Low that he was unable

5   to urinate or defecate, that he was in tremendous pain and actually showed Dr. Low his obviously

6   distended bladder while pleading for help.  Plaintiff has also presented evidence that Dr. Low's

7   response was to direct that plaintiff be returned to his housing unit while informing plaintiff that

8   if he continued to complain he would be transferred to another institution.  Plaintiff has also

9   submitted evidence that Dr. Low then failed to respond to correctional officers seeking his

10  assistance in responding to plaintiff's serious and worsening medical condition.[12]   As noted

11  above, the evidence of the party opposing a summary judgment motion is to be believed and all

12  reasonable inferences that may be drawn from the facts placed before the court must be drawn in

13  favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587.

14           The medical experts that defendant Low relies upon in moving for summary

15  judgment simply ignored or implicitly rejected plaintiff's evidence in forming their opinions.

16  While a jury may ultimately choose to reject plaintiff's evidence as insufficient to sustain his

17  burden of proof, under the well-established summary judgment standards set forth above, the

18  court cannot.  Because plaintiff has established a genuine issue of fact material to the

19  determination of whether defendant Low was deliberately indifferent to plaintiff's medical needs,

20  defendant Low is not entitled to summary judgment in his favor.  At trial, the jury will be called

21  upon to make credibility determinations and decide whether plaintiff's evidence establishes that

22  defendant Low was deliberately indifferent to plaintiff's medical care needs.  See Farmer, 511

23  U.S. at 847; Toguchi, 391 F.3d at 1057 n.4 (deliberate indifference to medical needs may be

24

25          [12]  In his declaration Dr. Grossfeld, plaintiff's medical expert, states that defendant Low's
    actions would constitute deliberate indifference so long as he was aware of plaintiff's medical
26  condition.  (Pl.'s Ex.s, Ex. Q at 2.)

1   shown by circumstantial evidence when the risk of harm is obvious and is ignored by the

2   defendant); Lolli v. County of Orange, 351 F.3d 410, 420-21 (9th Cir. 2003) ("[T]he officers'

3   indifference to Lolli's extreme behavior, his obviously sickly appearance and his explicit

4   statements that he needed food because he was a diabetic could easily lead a jury to find that the

5   officers consciously disregarded a serious risk to Lolli's health.)

6          B. Defendant Nurse Hu

7          Defendant Hu moves for summary judgment based on her contention that she:

8   (1) did not refuse to see plaintiff between May 28, 2000 and May 30, 2000; (2) saw plaintiff only

9   once on May 23, 2000; (3) properly performed her duties on May 23 by assessing whether

10  plaintiff needed to be seen by the on-call physician and gave plaintiff a ducat to see a physician

11  the next day; and (4) checked on plaintiff's status the night of May 23.  Defendant Hu argues that

12  she is entitled to summary judgment in her favor because the evidence establishes that she was

13  not deliberately indifferent to plaintiff's medical needs.  Plaintiff's evidence with respect to these

14  events differs dramatically from that presented by defendant Hu .

15         After reviewing the evidence, the court finds that there is a disputed issue of

16  material fact as to whether defendant Hu refused to see plaintiff on May 23, 2000.  As described

17  above, plaintiff has presented evidence supporting his contention that on two occasions that day,

18  correctional officers escorted him to the medical clinic because he was in severe pain and that

19  defendant Hu refused to see plaintiff.  Plaintiff has also presented evidence that defendant Hu did

20  not perform a physical assessment of him on May 23 and could not have checked on his status

21  that night without receiving a report that plaintiff was in pain.  As alluded to above, "[c]redibility

22  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

23  facts are jury functions, not those of a judge ...." Berry v. Baca, 379 F.3d 764, 769 (9th Cir. 2004)

24  (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Therefore, the summary

25  judgment motion should also be denied as to defendant Hu.

26  /////

1         Accordingly, IT IS HEREBY ORDERED that defendants shall file, either

2  electronically or in paper format, their exhibits identified in defendants' "List of Exhibits And/Or

3  Evidence Filed In Support Of Defendants' Motion For Summary Judgment," filed on April 15,

4  2005.

5         IT IS HEREBY RECOMMENDED that:

6         1.  Defendants' motion for summary judgment, filed on April 12, 2005 be denied

7  as to defendants Low and Hu;

8         2.  Defendants' motion for summary judgment, filed on April 12, 2005, be granted

9  as to defendants Greenough and Capon; and

10         3.  Defendants Greenough and Capon be dismissed from this action.

11         These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

13  after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within five days after service of the objections.  The parties are advised

17  that failure to file objections within the specified time may waive the right to appeal the District

18  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: June 22, 2005.

20

21                          DALE A. DROZD

                              UNITED STATES MAGISTRATE JUDGE

22  DAD:4
    babb0023.57

23

24

25

26